**SIGNED this 09th day of January, 2008.**

_____
**LEIF M. CLARK**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

### Western District of Texas
### San Antonio Division

| | |
|---|---|
| IN RE | BANKR. CASE NO. |
| MARTIN WRIGHT ELECTRIC COMPANY | 05-51436-C |
| *Debtor* | CHAPTER 7 |
| JOSE C. RODRIGUEZ, TRUSTEE | |
| *Plaintiff* | |
| v. | ADV. NO. 07-05041-C |
| CONSOLIDATED ELECTRICAL DISTRIBUTORS, INC., ET AL. | |
| *Defendant s* | |

### MEMORANDUM OPINION REGARDING MOTION OF DEFENDANT CONSOLIDATED ELECTRICAL DISTRIBUTORS, INC. FOR SUMMARY JUDGMENT

Jose C. Rodriguez, the chapter 7 trustee for Martin Wright Electric Company, filed this complaint seeking to avoid several pre-petition payments to creditors as preferential transfers under section 547 of the Bankruptcy Code. One of the named defendants, Consolidated Electrical Distributors, Inc. ("CED" or "Defendant"), filed a motion for summary judgment. For the reasons stated in this decision, the motion is denied.

## BACKGROUND FACTS[1]

Since 1906, Martin Wright Electric Company (the "Debtor") has been in the contracting business, specializing in commercial electrical work.  In the years leading up to the filing of this bankruptcy case on March 16, 2005, the Debtor, in its capacity as a contractor, hired CED to perform work as a subcontractor on a number of projects.  Throughout the course of these projects, CED submitted a number of invoices to the Debtor for work it performed.  In particular, in a period of time commencing no earlier than January 21, 2005 and continuing through the month of February 2005, the Debtor gave[2] checks to CED for a total of $1,267,950.49, as payment on these invoices.  The Trustee avers that these checks were honored within the ninety day period prior to the filing of the bankruptcy petition (the "Preference Period"), that the transfers were made on past-due amounts at a time when the Debtor was insolvent, and that the transfers enabled CED to receive more than it would have received in a chapter 7 liquidation had the transfers not been made.  Thus, says the Trustee, all the transfers are voidable under section 547(b).  *See Complaint* ¶¶ 6-7 (Doc. #1).

CED answered the complaint, denying that it received more through the pre-petition transfers than it would have received under a hypothetical chapter 7 liquidation, an essential element of the Trustee's *prima facie* case under section 547.  *See* 11 U.S.C. § 547(b)(5), (g).  CED also claims that it did not receive a transfer of the debtor's interest in property, another essential element of the Trustee's *prima facie* case.  Says CED, the payments made to it were impressed with a trust under

---

[1] On a motion for summary judgment, the court does not make factual findings as such.  This section simply lays out the general contentions of the parties for ease of reference.

[2] The affidavits show that the first check, in the amount of $828,707.13, was received by CED on January 21, 2005.  It could not have been honored any earlier than the date of its receipt, and the date of honor is the date of the transfer, for purposes of section 547(b).  *See* 11 U.S.C. § 547(e)(1)(A), (e)(2)(A); *Barnhill v. Johnson*, 506 U.S. 393, 400, 112 S.Ct. 1386, 1390, 118 L.Ed.2d 39 (1992).

-2-

the Texas Construction Trust Fund statute ("CTF"), and so were "earmarked" for CED, meaning that, under applicable case law, the funds used to pay CED were not "property of the Debtor." *See id.* § 547(b). CED also claims that the Trustee's action fails because the trustee cannot prove that CED received more than it would have received in liquidation had the transfer not been made (yet another essential elements in the Trustee's *prima facie* case). This assertion is based on its belief that the trustee would have had to have paid CED in any event once the case was filed, because any operating funds that came into the trustee's hands as of filing would have been impressed with a trust in favor of *inter alia* CED, again by virtue of the Texas Construction Trust Fund statute.

CED also asserts several affirmative defenses. Pertinent to the underlying Motion, CED claims that (1) CED's waiver or forbearance of statutory lien rights constituted new value in a contemporaneous exchange with the Debtor under section 547(c)(1); (2) the transfers were part of the Debtor's ordinary course of business, triggering the exception under section 547(c)(2); and (3) the transfers involve the fixing of a statutory lien that is not otherwise avoidable under section 545, and thus fall within another exception under section 547(c)(6). *See Answer* ¶¶ 9-21 (Docket #21). CED has the burden of proof at trial with respect to the section 547(c) defenses. *See* 11 U.S.C. § 547(g). It would also have, at the very least, the burden of going forward with evidence on its "earmarking" defense. *See Washburn v. Harvey,* 504 F.3d 505, 508 (5th Cir. 2007) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed. 265 (1986)).

CED has filed this Motion for Summary Judgment, based on its Construction Trust Fund statute arguments, and based on its affirmative defenses. In support, CED offers two supporting affidavits, one executed by Andrew Micknicz, the Division Credit Manager for CED, and the other by Roy Wahne, offered as an expert witness with respect to customary business practices of general

-3-

contractors, subcontractors, and property owners. Each of these affidavits is briefly summarized here.

Roy Wahne (the proffered expert witness) testified that it is common industry practice for subcontractors to go months — often, up to 120 days — without payment from contractors, because contractors normally do not pay subcontractor invoices until the contractor is paid on a draw request to the property owner. Said Wahne, subcontractors routinely file lien notices, and then liens, with respect to outstanding unpaid invoices as soon as permitted under state law. They release these liens only when they receive payment. And, said Wahne, the liens are typically released almost immediately in what he describes as a "contemporaneous transaction." *See* Wahne Affidavit at ¶ 7 (Docket # 58, Ex. C).

Andrew Micknicz, in his affidavit, said that CED followed the general business practice outlined by Wahne in his affidavit. He said that CED filed statutory mechanic's liens on the project property for each invoice on which the Debtor failed to make payments. When CED received a check from the debtor for $828,707.13 on January 21, 2005, Micknicz himself executed a Waiver of Lien Rights "contemporaneously" — though the affidavit does not state on what date the Waiver was actually executed. CED received three more checks from the Debtor on February 28, 2007, totaling $432,598.22.[3] Micknicz stated that he also executed Waivers for those payments "contemporaneously," though once again he fails to state the date of execution of the Waivers.[4]

---

[3]   $81,235.07 (check 9144), $109,693.46 (check 9146), and $232,669.69 (check 9145) are all dated February 23, 2005. Micknicz Affidavit at ¶ 12 (Doc. #58, Ex. A).

[4]   While CED asserts that these transactions were contemporaneous exchanges, the Trustee contests this contention, stating that whether the transactions are truly contemporaneous is a matter of fact. Because the affidavits do not disclose the date of execution of the Waivers, the Trustee is correct that a fact issue remains, even if the exchanges could otherwise potentially qualify as a matter of law. The latter law question is discussed later in this Opinion.

After these Waivers were executed and delivered, one of these checks (for $232,669.69) bounced. Micknicz does not say whether the debtor ever made good on this check.

The Trustee, in response, says, with respect to CED's CTF defenses[5] that the linchpin for their success is establishing the existence of a trust. The Trustee then points out that it is uncontroverted that the Debtor used a single operating account, and that all funds alleged to be impressed with a trust were commingled with other non-trust funds. Thus, says the Trustee, CED had the burden of tracing any trust funds alleged to be in this account. CED offered no summary judgment evidence on tracing, so its defenses premised on the application of the CTF must fail, maintains the Trustee. *See Rosenberg v. Collins,* 624 F.2d 659, 663 (5th Cir. 1980) (citing *Schuyler v. Littlefield,* 232 U.S. 707, 34 S.Ct. 466, 58 L.ed. 806 (1914)) ("To establish a trust relationship that excludes property from the bankruptcy estate, a claimant must: (1) prove the existence of the trust; and (2) trace the identity of his property."); *see also Lovett v. Homrich, Inc. (In re Philip Servs. Corp.),* 359 B.R. 616, 628 (Bankr. S.D. Tex. 2006).

The Trustee also disagrees as a matter of law with CED's alternative argument that CED received no more than it would have received in liquidation anyway. That defense is premised on the notion that CED was a "lien creditor." If CED had not been paid, it would not have released its liens, and so would have been a lien creditor as of the bankruptcy filing, and so would have been paid in full in any event. The Trustee counters that CED's mechanic's liens were never liens on the *Debtor's* property. They were liens on the project property, owned by third parties. Any recovery

---

[5] CED uses the Texas Construction Trust Fund statute in two ways. First, CED says that each transfer made consisted of "trust funds" which were not property of the debtor, so that an earmarking defense is made out. Second, CED says that, if the transfers had not been made, CED would have been paid at least as much anyway because the all the funds in the operating account of the debtor were impressed with a trust pursuant to the CTF.

-5-

that CED might make by enforcing those liens would occur as a result of its entitlements under non-bankruptcy law, and not by virtue of any distribution from the bankruptcy estate.

With regard to the contemporaneous exchange affirmative defense, the Trustee argues that the summary judgment evidence fails to establish contemporaneity – Micknicz asserts the releases were "contemporaneous," but fails to furnish the dates of lien releases.  Legal conclusions are not evidence, says the Trustee.  The Trustee also says that the lien waivers cannot count as "new value" for purpose of the (c)(1) defense, because the entity benefitted by the lien releases was the project owner, not the Debtor.  The Trustee points out that the evidence fails to tie the lien releases to any "new value" received by the Debtor, within the meaning of subsection (c)(1).

As for the ordinary course defense, the Trustee says that there are genuine issues of material fact with regard to CED's contention that payments made by the Debtor to CED were made in the ordinary course of the business or financial affairs of the Debtor and CED.  The Trustee notes, for example, that payments on specific job invoices were *not* necessarily made out of funds from draw requests on that project, the linchpin of CED's ordinary course of business argument.  In addition, while Wahne's affidavit offers some evidence of industry practice, Micknicz' affidavit merely makes the legal conclusion that its payments were received in the ordinary course of business.

Neither party addresses the section 547(c)(6) defense, either in their moving papers or in their affidavits.  It is sufficient to say that this defense is inapplicable to the facts of this case as it only addresses the situation in which the transfer sought to be avoided is one that involves the fixing of a statutory lien on the *debtor's* property.  The only statutory liens at issue in this case appear to be the statutory mechanic's liens filed by CED.  Those liens were fixed on the owner's property, not the Debtor's property.  *See* 11 U.S.C. § 545.

-6-

## DISCUSSION

**Legal Standard**

In an ordinary preference action, the plaintiff trustee carries the burden of proving all seven elements set out in section 547(b).[6]  *See* 11 U.S.C. § 547(g).  When the defendant moves for summary judgment, the defendant need only establish, with regard to the plaintiff's case in chief, that there is no genuine issue of material fact regarding at least one of those elements, and that as a matter of law, the facts demonstrate that the particular element is not met.  *See Harbor Ins. Co. v. Trammel Crow Co., Inc.,* 854 F.2d 94, 98 (5th Cir. 1988); FED. R. CIV. P. 56(c); FED. R. BANKR. P. 7056.  In response, the plaintiff must introduce summary judgment evidence demonstrating that there is at least a material issue of fact regarding that element that can properly be characterized as outcome-determinative.  *Hancey v. Energas Co.,* 925 F.2d 96, 97 (5th Cir. 1990).  "Legal conclusions and general allegations do not satisfy this burden."  *Id.* (citing *Fentenot v. Upjohn Co.,* 780 F.2d 1190, 1195-96 (5th Cir. 1986)).  Alternatively, the plaintiff can demonstrate that the uncontroverted facts favor the plaintiff as a matter of law.

The analysis is slightly different with respect to a defendant's affirmative defenses, because in a trial on the merits, the defendant bears the burden of proof with regard to affirmative defenses, including those set out in section 547(c).  *See* 11 U.S.C. § 547(g).  When the defendant moves for summary judgment on its affirmative defenses, it must establish "beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in [its] favor."  *Martin v. Alamo Comm.*

---

[6]  The statute only lays out five subparts, but the language of the introductory clause contains two additional elements that must be met.  The seven elements are that the debtor (1) made a transfer (2) of the debtor's interest in property (3) to or for the benefit of a creditor (4) as payment on an antecedent debt (5) while the debtor was insolvent (6) within the 90 days of filing (or one year, in the case of insider preferences), and (7) which allowed the creditor to receive more than it would have in an ordinary chapter 7 liquidation had the transfer not been made.

-7-

*College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (internal quotations omitted). The plaintiff trustee, in response to the motion with regard to an affirmative defense, need only raise a material issue of fact as to any one element of the defendant's affirmative defense, in which case summary judgment would be denied. Alternatively, the plaintiff might demonstrate that the defendant's application of the law to the uncontroverted facts is wrong as a matter of law.

In evaluating the propriety of a summary judgment motion, the court must draw all reasonable inferences in favor of the non-movant (in this case, the plaintiff Trustee). *See id.*

### 1. Were Payments Made to CED "Property of the Debtor" at the Time of Transfer?

CED first defense is that the payments it received during the Preference Period were not property of the Debtor when they were made. *See* 11 U.S.C. § 547(b). CED relies on the earmarking doctrine, and on its reading of the Texas CTF. *See* TEX. PROP. CODE §§ 162.001 et Seq. (Vernon 2007).

A. *Burden of Proof*

At the outset, we need to address the question of burdens of proof with regard to these two defenses. The preference statute imposes on the plaintiff the burden of proving that the transfers were of "an interest of the debtor in property." *See* 11 U.S.C. § 547(b, g). But does that also mean that the Trustee has the burden of anticipating and affirmatively negating the defenses raised by CED? The short answer is "no."

The defense that the payments in question were impressed with a trust under Texas' Construction Trust Fund statute relies for its efficacy on the Defendant establishing the requisite elements that such a trust arose, that the trust remained in existence throughout the period of time in which these payments were made, and that the trust is a "true trust," rather than just a species of

remedy. *See Rosenberg,* 624 F.2d at 663 (citing *Schuyler,* 232 U.S. at 707, 34 S.Ct. at 466); *see also In re Philip Servs. Corp.,* 359 B.R. at 628-29. The Trustee does not have to *disprove* these elements; the defendant has to *establish* them. *See Martin,* 353 F.3d at 412. CED may be aided by a couple of presumptions built into the state statute, but even so, the existence of a presumption does not erase the burden of proof on the party in whose favor the presumption arises — it merely eases that burden. *See Sandoz v. Fred Wilson Drilling Co. (In the Matter of Emerald Oil Co.),* 695 F.2d 833, 838 (5th Cir. 1983) (quoting Fed. R. Evid. 301) (noting that the presumption of the debtor's insolvency within 90 days of filing does not shift the burden of proof or non-persuasion in a preference avoidance action but merely requires the opposing party to come forward with summary judgment evidence to rebut or meet the presumption); *see also Gasmark Ltd. Liquidating Trust v. Louis Dreyfus Nat. Gas Corp.,* 158 F.3d 312, 315 (5th Cir. 1998) (stating that, when a movant for summary judgment relies on a statutory presumption for part of its *prima facie* case, the non-movant must, at the very least, "raise a genuine issue of material fact concerning whether it rebutted the presumption").

The earmarking defense is somewhat trickier. The doctrine is judicially created, and so also are the assignments of burden of proof and burden of going forward with the evidence. The courts are not in agreement as to which party must bear these burdens. *Compare Coral Petroleum, Inc. v. Banque Paribas-London,* 797 F.2d 1351, 1356 (5th Cir. 1986) (focusing on whether the property transferred was in the debtor's dominion and control — a mere defense to an essential element of the plaintiff's *prima facie* case) *with McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enter., Ltd.),* 859 F2.d 561, 565-66 (8th Cir. 1988) (finding the doctrine to be in the nature of an affirmative defense with essential elements to be proven by the defendant as a matter of law, akin to a surety,

novation, or guarantee).[7] Because the nature of the defense is that the funds in question never truly *were* the debtor's property — that is, the debtor allegedly never obtained dominion and control over the funds — the earmarking defense as applied in the Fifth Circuit is, in essence, a defense as opposed to an affirmative defense. Thus, the Defendant would have the burden at trial of coming forward with evidence sufficient to raise the defense, though the Trustee would still have the ultimate burden of proving whether what was transferred was the debtor's property. At summary judgment, then, CED had the burden of placing into the record evidence sufficient to make out a *prima facie* case that the Debtor lacked dominion and control over the funds in question and was a "mere conduit" with respect to their disposition. *Washburn,* 504 F.3d at 508 (quoting *Celotex Corp.,* 477 U.S. at 323). With this as prelude, we turn to the defenses themselves, starting with the earmarking defense unaided by the CTF.

B. *The Earmarking Defense*

The "earmarking" defense, as espoused in this circuit, applies if the facts demonstrate that the debtor did not hold "legal title" to the funds transferred to a preference defendant at the time of the transfer. To determine whether the debtor in fact holds such title, the Fifth Circuit requires the defendant to show that the debtor never gained "general control over the funds whereby it could

---

[7] This issue is compounded because there are two distinct theories of earmarking. The nature of those two theories is such that, with regard to one (the common agreement theory), the defense is more like an affirmative defense ("yes, but"), while with regard to the other (the dominion and control theory), the defense is more like a simple defense ("no, it's not"). *See generally Official Comm. of Unsecured Creditors v. Columbia Forest Prods., Inc. (In re Hardwood P-G, Inc.),* 2007 WL 1728653 at *4, Bankr. Case No. 06-50057-lmc, Adv. No. 06-5278-lmc (Bankr. W.D. Tex. June 12, 2007). "While the Eighth Circuit's Bankruptcy Appellate Panel focuses on agreement, diminution of the debtor's property, and substitution of creditors, the Fifth Circuit focuses more closely on whether the property in question was ever in the control of the debtor, making that the touchstone of whether the debtor's property has been diminished." *Id.*

independently designate to whom the money would go."[8]   *See In re Philip Servs. Corp.,* 359 B.R. at 629 (citing *Coral Petroleum, Inc.,* 797 F.2d at 1362 n.12).

The base facts of this case do not raise the earmarking defense.  Both parties agree that subcontractor invoices may go unpaid for some time, until the contractor itself is paid by the owner on a draw request.  It is true that, in the draw request, the contractor often *justifies* the draw request with evidence of work done to date, and may even include copies of subcontractor invoices.  The owner may well *intend* for the draw payment to be applied toward the satisfaction of outstanding subcontractor invoices, lest subcontractors place liens (or refuse to release liens) on the owner's property.  *See* TEX. CONST. art. XVI § 37; TEX. PROP. CODE §§ 53.001 et Seq. (Vernon 2007).  Neither of these observations much matter when it comes to testing whether earmarking applies, however.  Under the doctrine as applied in the Fifth Circuit, what counts is that the Debtor had unfettered control over its operating account.  All monies received from all jobs were deposited into a single operating account, and the Debtor made disbursements of all types, with regard to all its jobs, out of that single account.  Far from lacking sufficient dominion and control, the Debtor in this case appears to have had *exclusive* dominion and control over its operating account.

A stronger case for earmarking might have been made had the facts shown that the owner only issued "joint checks" on its jobs, for example, or that the owner withheld payment on draws

---

[8] This defense in this circuit also goes under the "mere conduit" defense, on the theory that the defense applies when the debtor is just passing along funds from one party to another party who happens to be a creditor of the debtor. Because a picture is worth a thousand words, think of the sports fan in the middle of a row at a baseball stadium, ordering a beer from the hawker in the aisle.  All of the folks in between, who hand down the beer, and hand back up the money are "mere conduits" — though money is placed in their hands (and they could, one supposes, simply put the money in their pocket), everyone understands that its not really their money and they are just passing it along to the person who is supposed to receive it from the sender.  And if the sender is paying for your beer, and passes the money down the row, and you happen to be one of the folks between the sender and the hawker, you are the perfect example of the "mere conduit" — someone else decided to pay for your beer and handed you the money to hand on to the beer hawker.  In the context of a preference action, the money paid to the hawker was never your property even though you held it and then transferred it (through others on your row) to the beer hawker.

until subcontractors were paid. *See In re Philip Services Corp.*, 359 B.R. at 629. But these are not the facts of this case. Here, the Debtor apparently enjoyed unfettered discretion over whom it paid and whom it did not pay. Under the Fifth Circuit's version of the "earmarking doctrine," *see In re Coral Petroleum, Inc.,* 797 F.3d at 1362, the defense is not raised on these base facts.

CED has a second theory for why the transfers involved here were not "property of the debtor," one that rests on the Texas Construction Trust Fund statute. It is to that issue that we next turn.

C. *The Texas Construction Trust Fund Statute and the Problem of Tracing*

CED maintains that payments made to it by the Debtor came from funds already impressed with a trust imposed under the CTF. *See* TEX. PROP. CODE §§ 162.001 et Seq. (Vernon 2007). CED argues that trust funds, by definition, cannot be "property of the debtor," and payments made from such funds could not be preferential.

There is no factual dispute that CED was paid with checks drawn on the Debtor's operating account. There is also no factual dispute that the Debtor had only one account into which all of its receipts from all sources were deposited and from which all payments to all creditors, vendors, employees, bank lenders, and subcontractors were made. There were no other accounts into which deposits were made or out of which payments were made to subcontractors. In short, the evidence is uncontroverted that the account said to have been impressed with a trust under the CTF contained monies from multiple sources, resulting in considerable commingling. The evidence is similarly uncontroverted that payments to all sorts of creditors and other parties in addition to CED were made out of this account. For CED's argument to prevail, CED must prove first that, as a matter of law, its trust fund theory has legs in the preference context and must prove second that, as a matter of fact,

-12-

such a trust was impressed on the very funds that were transferred to CED by the Debtor at the time of each of the transfers. We look first at the law question.

When the CTF says that construction payments received by a contractor are "trust funds," does that mean that the statute creates a "true trust" or an "express trust?" If the answer is yes, could it be said that transfers of those funds made to a trust beneficiary — *e.g.,* CED — would not count as transfers of "property of the debtor?" *See* 11 U.S.C. § 547(b); TEX. PROP. CODE §§ 162.001-162.003 (Vernon 2007).

At first glance, the "trust" alleged to be imposed by the CTF looks less like a "true trust" and more like a remedy. *See Southmark Corp. v. Grosz (In the Matter of Southmark Corp.)*, 49 F.3d 1111, 1117-18 (5th Cir. 1995) (distinguishing true trusts from remedies invoked in a debtor-creditor relationship); *see also In re Monnig's Dept. Stores, Inc. v. Azad Oriental Rugs, Inc. (In the Matter of Monnig's Dept. Stores, Inc.)*, 929 F.2d 197, 202-03 (5th Cir. 1991) (observing that trusts cannot be imposed upon ordinary debtor-creditor relationship without a showing of extraordinary wrongdoing) (citations omitted). The trust only attaches to funds once they are already received from the project owner and deposited into the contractor's operating accounts, making the trust look more like an *ex post* remedy in the event that subcontractors are not paid after contractors are paid on draw requests. What is more, the statutory trust applies only to funds that are deposited into the contractor's operating accounts, over which the contractor presumably has general custody and control, and the discretion to spend money as it sees fit. *See Matter of Southmark Corp.*, 49 F.3d at 1116-17 (holding that a cash management account managed by debtor parent entity from which payment was made to a creditor was "property of the debtor," even though the check issued stated that it was payment from a subsidiary); *see also Coral Petroleum, Inc.,* 797 F.2d at 1358 (stating that

-13-

the test for whether earmarking applies is whether the debtor was a mere conduit as opposed to being "in control" of the property transferred). Furthermore, the CTF lacks some of the characteristics one would expect to find in a true trust. *See Boyle v. Abilene Lumber, Inc. (In the Matter of Boyle),* 819 F.2d 583, 586 (5th Cir. 1987). For example, the statute is explicit that the same funds alleged to be impressed with a trust in favor of subcontractors can *also* be subject to a prior perfected security interest in favor of a lender of the Debtor, unaffected by the alleged trust. *See* TEX. PROP. CODE § 162.004(a). The statute also does not expressly require the contractor to segregate the funds into an identifiable *res*, as one would expect of a true trust. *See Tex. Lottery Comm'n v. Tran (In the Matter of Tran),* 151 F.3d 339, 342-43 (5th Cir. 1998). Finally, the CTF explicitly exempts "trust funds" from the application of the Texas Trust Act — further question whether the statute creates a "true trusts" at all. TEX. PROP. CODE § 162.004(b).

Despite these legal obstacles, CED's legal position has the best possible support — a decision of the Supreme Court of the United States. In *Begier*, the Court ruled that, for purposes of section 547(b), "property of the debtor" should be read to be the *pre-petition analog* to "property of the estate." *See Begier v. Internal Revenue Servs.,* 496 U.S. 53, 58-59, 110 S.Ct. 2258, 2263, 110 L.Ed. 46 (1990). Said the Court:

> Because the purposes of the avoidance provision is to preserve the property includable within the bankruptcy estate — the property available for distribution to creditors — *"property of the debtor" subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceeding.* For guidance, then, we must turn to § 541, which delineates the scope of "property of the estate" and serves as the post-petition analog to § 547(b)'s "property of the debtor."

*Id.* at 58-59 (further noting in a footnote that "Section 547(b) thus now mirrors § 541's definition of

-14-

'property of the estate' as certain 'interests of the debtor in property'"). The *Begier* Court then noted

that, if funds are held "in trust," then a transfer of those funds cannot be a voidable preference

because no interest of the debtor in property has been transferred. *See id.* at 66-67 (applying the

principle to payment of "trust fund" taxes).

The Fifth Circuit has applied *Begier* in context of post-petition funds, holding that the trust

created by virtue of section 111.016 of the Texas Tax Code is one that is enforceable by the

beneficiary of the trust against the estate. *Matter of Al Copeland Enters., Inc.,* 991 F.3d at 235; *see*

*also Matter of Southmark Corp.*, 49 F.3d at 1118;  *see also* 11 U.S.C. § 541(d).  In *Al Copeland*

*Enterprises*, the Fifth Circuit ruled that the property in question had to be turned over to the taxing

authority and could not be administered for the benefit of the estate's creditors because it was

deemed effectively not "property of the estate," based on the Supreme Court's ruling in *Begier*.

The Fifth Circuit has not yet had occasion to apply *Begier* in the preference context, but there

is no reason to think that it would not follow its holding, given how the court ruled in *Al Copeland*

*Enterprises*.  The "trust" argument is legally distinct from the earmarking doctrine (though of course

both reach the same end — the property in question is not "property of the debtor"),[9] so it is of little

moment that the *Southmark* "actual control" test for earmarking has little relevance in the statutory

trust context.  It is probably best to conclude, then, that the Fifth Circuit would, following *Begier*,

find that property subject to the statutory trust imposed by the CTF is not "property of the debtor"

for purposes of a preference suit.

---

[9] The legal basis for reaching the ultimate conclusion in the earmarking context is premised on the notion that, if the debtor does not exercise actual dominion and control over the asset, then it cannot be fairly said to be the debtor's property.  The legal basis for the ultimate conclusion in the statutory trust context is premised on the notion that, if the debtor is deprived of the legal right to dispose of the property as it wishes, then the asset cannot be fairly said to be the debtor's property.

But even if CED is right about its CTF statutory trust argument as a matter of law, it has a problem as a matter of fact. At trial, CED will have the burden of proving that the funds transferred were impressed with a trust at the time of the transfer. The CTF statutory trust arises when funds are *received*. The uncontroverted evidence in this case, however, is that *all* payments on *all* jobs were deposited into a *single* account, resulting in a commingling. What is more, the uncontroverted evidence is that *all* disbursements on all jobs (as well as payments for non-job related items) came out of this self-same account. When this sort of commingling occurs, the beneficiary of a claimed trust must be able to trace the claimed trust funds in the commingled account for the entire relevant period, using an accepted method of tracing. *See In re Al Copeland Enters., Inc.,* 133 B.R. 837, 840 (Bankr. W.D. Tex. 1991) (opinion of the bankruptcy court) *aff'd by Matter of Al Copeland Enters., Inc.,* 991 F.2d 233 (5th Cir. 1993); *see also In re Philip Servs. Corp.,* 359 B.R. at 628. If the party alleging the trust's existence cannot successfully trace the trust funds, it will be presumed that all funds disbursed were non-trust funds — *i.e.*, property of the debtor. *See Cunningham v. T&R Demolition, Inc. (In re ML & Assoc., Inc.),* 301 B.R. 195, 200 (Bankr. N.D. Tex. 2003) (holding that *Southmark* raises the presumption that funds alleged to be held in trust are "property of the debtor," and the presumption may be rebutted only by the beneficiary's successfully tracing the funds).[10] What is more, the tracing must be accomplished with respect to each transfer, because there were multiple deposits and withdrawals into and out of this account.

---

[10] The Fifth Circuit is not alone in requiring tracing of funds alleged to be impressed with a trust. *See, e.g., First Federal of Mich. v. Barrow,* 878 F.2d 912, 915 (6th Cir. 1989) (citing 4 L. King *Collier on Bankruptcy,* ¶ 541.13, at 541-78-541-79 (15th ed. 1988)) (addressing the concept in the context of what property becomes property of the estate as of the commencement of a case); *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95-96 (3d Cir. 1994); *Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Investments Associates, Inc.),* 48 F.3d 470, 474 (10th Cir. 1995); *Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 850 F.2d 1275, 1279 (8th Cir. 1988).

-16-

When tracing trust funds in a commingled account, the accepted method employed by most courts is the "lowest intermediate balance."[11]  *See, e.g., In re Al Copeland Enters., Inc.,* 133 B.R. at 839; *In re ML & Assoc.,* 301 B.R. at 200; *see also supra* note 10 (listing cases).   Under this methodology, the party alleging the existence of the trust must prove that:

> [A]t all [relevant] times the Debtor had sufficient funds on hand to fully pay the trust fund claims.  This latter requirement is imposed because if the balance of cash on hand on any interim day was less than the amount of the trust fund claims, then the trust fund claims are limited to that "lowest intermediate balance."

*In re Al Copeland Enter., Inc.,* 133 B.R. at 839.  As the Fifth Circuit has already used the test in the analogous *Copeland* context, the fair assumption is that the same test should be used here.

The summary judgment evidence offered by CED fails to offer any cognizable evidence that would satisfy CED's burden of making out a *prima facie* case for its CTF defense.  It is true that Micknicz stated in his affidavit that he reviewed the Debtor's *deposit* slips for the months of January and February 2005, and true as well that, based on that review, he found several deposits during January 2005 identifiable as draw proceeds on jobs on which CED performed work.  Micknicz draws the conclusion that these deposits "would be trust fund sums paid to the Debtor to be held for the benefit of [CED] . . . ."  Micknicz Affidavit at ¶ 16 (Doc. #58, Ex. A).  Even if this otherwise impermissible legal conclusion is correct, it falls short of the evidence needed to make out CED's *prima facie* case because it does not then trace activities in the account between the time of the

---

[11]  It appears that CED misunderstands the application of the "lowest intermediate balance" test in *Philip Services*.  CED argued in the Motion that Judge Steen "summarily dispensed with the lowest intermediate balance rule."  That is not an accurate statement of that case.  In *Philip Services*, the parties stipulated that the debtor's accounts contained sufficient funds during the applicable period to pay all but $147,495.71 of the $936,741.35 pre-petition transfer.  *In re Philip Servs. Corp.,* 359 B.R. at 629.  The defendant argued that the funds in the debtor's accounts were *not* property of the estate, and the court required tracing under the lowest intermediate balance rule.  *Id.*  However, due to the complex accounting system used by the debtor, the court concluded that tracing was impossible and that the stipulation alone was insufficient to satisfy the tracing burden.  *Id.*

deposits and the time of the payments made to CED drawn on this account. It is not possible to arrive at a "lowest intermediate balance" until the rest of these evidentiary pieces are supplied. CED's evidence falls well short of tracing. The same observation applies to the affidavit evidence regarding deposits in February 2005. Thus, a material issue of fact remains with regard to CED's CTF defense such that summary judgment on this defense must be denied.

**2. Did the Transfers Enable CED to Receive More Than It Would Have Received in a Chapter 7 Liquidation Had the Transfers Not Been Made?**

CED also maintains that the Trustee's preference action must fail because the Trustee cannot prove the seventh element of a preference action — namely, whether the transfers enabled CED to receive more than it would have received in a chapter 7 liquidation had the transfers not been made. CED bases this contention on its view that, had the transfers not been made, those funds would have been impressed with a trust under the CTF. Moreover, argues CED, under *Al Copeland Enterprises*, these funds would not be property that the estate could administer, given that the estate would hold only legal title, and not equitable title, to the funds.[12] The Trustee counters that CED received payment on 81% of its total claims against the Debtor as a result of the transfers, while it would have received only five percent in a chapter 7 liquidation had the transfers not been made. This latter number is based on the Trustee's estimate of the likely distribution to unsecured creditors in this case.[13]

---

[12] Actually, CED's argument was less direct than this description, but the essential meaning of the argument is captured here.

[13] Technically, the trustee has misstated the first number. While it may be true that CED had additional unsecured claims remaining to be asserted against the estate as of the filing date, those claims on which it received payment were satisfied 100%, not 81%. A simple example demonstrates why this is so: An unsecured creditor is owed $140,000. It is paid $14,000 within 90 days before filing. Say that the chapter 7 estate pays 10 cents on the dollar. Then, *by definition,* the payment allowed the creditor to receive more than it would have received in chapter 7 had the transfer not been made. Here is the math, first **with the preference paid**: $14,000 + (10% x ($140,000 - $14,000)) =

-18-

Once again, CED's argument turns on whether it can trace the funds held in the CTF statutory trust up to the bankruptcy petition date using a measure such as the lowest intermediate balance test. The summary judgment record falls short as it fails to trace activity in the operating account. Summary judgment in favor of CED on this element of the Trustee's case therefore must be denied.[14]

**3.  The Affirmative Defenses**

CED also argues that the summary judgment evidence is sufficient to establish that, as a matter of law, even if the transfers were preferential under section 547(b), they are subject to at least one of two affirmative defenses under section 547(c).  CED of course bears the burden of proof with respect to affirmative defenses, and so must establish that there is no issue of material fact with respect to any of the elements of each of these affirmative defenses, and that, as a matter of law, the evidence establishes that the transfers in question fall within one or both of the affirmative defenses asserted. *See* 11 U.S.C. § 547(g).  The Trustee, to avoid summary judgment, must either demonstrate that there remain material issues of fact with respect to at least one element of each defense, or in the alternative that, as a matter of law, the evidence presented does not establish that one or both of

---

$14,000 + (10\% \times \$126,000) = \$14,000 + \$12,600 = $ **$26,600 to the creditor**.  Now, with the **preference *not* paid**: $140,000 \times 10\% = $ **$14,000 to the creditor**.  *See* Elizabeth Warren & Jay Westbrook, The Law of Debtors and Creditors 491, Problem 23.1 (Aspen, 5th ed. 2005).

[14] There is some loose language in the motion suggesting that CED would have been a "secured creditor" as of the date of the bankruptcy filing, but that argument misses the mark.  CED's mechanic's lien filings (which arguably would not have been released if CED had not been paid — and that's the hypothetical posed by section 547(b)(5)) gave CED a security interest in the *owner's* property, not the *contractor's* property.  It is the *contractor* who filed for bankruptcy relief.  CED would thus not be a secured creditor as to the debtor's bankruptcy estate.  What CED would receive in a chapter 7 distribution would thus not be altered.  To be sure, CED would have a "secured guaranty" on the same debt against the owner, but that only assures that CED would get paid by *someone*.  It would not alter the liquidation analysis in terms of what CED received from the estate, save in one respect – the estate would distribute *less* to CED were it to recover from the owner via its mechanic's lien, because the estate would be entitled to a credit for the payment by a third party.  The estate would presumably then owe the amount of money paid to CED by the owner to the owner, under normal principals of subrogation, thereby substituting the owner for CED on the debt.  *See* 11 U.S.C. § 509(a), (c).

-19-

the affirmative defenses apply.

The two affirmative defenses asserted by CED are contemporaneous exchange for new value, *see id.* § 547(c)(1), and transfer in the ordinary course of business, *see id.* § 547(c)(2). Each is discussed below.

A. *Contemporaneous Exchange for New Value*

CED first asserts that the pre-petition transfers should count as contemporaneous exchanges for new value, consisting of CED's waiver or forbearance of its statutory lien rights. *See id.* § 547(c)(1). The contention will not work as a matter of law, however. First, to establish that a transfer is a contemporaneous exchange *for new value*, CED must prove that, by waiving its liens, the *Debtor* received something new that is of tangible value. *See Gulf Oil Corp. v. Fuel Oil Supply & Terminaling, Inc. (In re Fuel Oil Supply & Terminaling, Inc.)*, 837 F.2d 224, 230 (5th Cir. 1988). The lien releases that CED executed upon receipt of payment from the Debtor redounded to the benefit of the project *owner*, but not necessarily the Debtor. CED relies on *In re Philip Services Corp.* for the proposition that a waiver of construction liens in exchange for payment counts as new value, but the reliance is inapposite. *See In re Philip Servs. Corp.*, 359 B.R. at 632. In *Philip Services*, the subcontractor was required to release its lien against the project owner's property *before* the owner would release project funds to the debtor contractor, per the terms of a prior agreement between the project owner and the debtor contractor. *See id.* at 632. The court ruled that this agreement made any statutory lien asserted by a subcontractor a *de facto* lien on the debtor's accounts receivable. *Id.* at 633. The project funds due to the debtor-contractor in that case were over $1 million, far exceeding the amount due to the subcontractor. *Id.* Thus, when the subcontractor released its statutory lien on the project owner's property (after receiving payment from the debtor-

-20-

contractor), the debtor-contractor immediately received over $1 million from the property owner. That, said the court, was tangible "new value" within the meaning of section 547(c)(1) and *Fuel Oil Supply*.

Here, by contrast, CED's lien releases were executed *after* the project owner had *already* paid the Debtor.  The lien releases did not "cause" the *Debtor* to receive any "new" value — or, at least, the summary judgment evidence does not demonstrate that any new value came to the Debtor as a result of the lien releases being executed.  CED's own affidavits confirm that the Debtor received payment from project owners *before* the subcontractor liens were released.[15]  There is no other evidence in the record to tie any tangible benefit received by the Debtor either to the Debtor's paying CED or to CED's releasing its liens as a result of that payment.  Absent such a showing, summary judgment on this defense is inappropriate on this ground alone.

Summary judgment for this defense fails for another reason as well.  CED failed to establish that the pre-petition transfers did not deplete the estate to the detriment of other unsecured creditors. *See In re Fuel Oil Supply*, 837 F.2d at 230.  The only argument offered by CED to prove this element is that the funds were to be held in trust for the benefit of CED, such that the funds, had they not been paid, would not be distributed to other unsecured creditors anyway.  This is a plausible argument.  However, as already discussed *supra*, the argument requires a quantum of proof not present on this record — the establishment of a trust that remained *in esse* up to the date of filing. If CED cannot trace the alleged trust fund in the Debtor's operating account up to the petition date, the presumption is that all such trust funds were depleted, and all remaining monies in the account

---

[15] Perhaps CED wishes the court to presume that further disbursements from project owners would not have been forthcoming had the mechanics' liens not been released.  That the court will not (and should not) do, however, especially at the summary judgment stage of this case.

would come into the estate, unencumbered by any trust. CED has not presented the court with the evidence needed to sustain that tracing burden. Once again, it may be that CED will be able to sustain this burden at trial. It has not, however, made the case as a matter of summary judgment.

Finally, CED has not established contemporaneity. The checks issued to CED were in payment of invoices generated months before, for services performed months before. The services rendered for which payment was made were certainly not contemporaneous new value. Even if the claim is that the "new value" in exchange for which payment was received was the release of liens on the owners' property (and the court has already discussed *supra* the problems with this argument), the summary judgment record only contains the conclusory statement of Micknicz that lien releases were "promptly" executed when payment was received. Copies of the lien releases reflecting their date of execution were not included in this summary judgment record. As the question whether payment is "contemporaneous" is fact sensitive, and the burden of proof lies with CED to establish that there are no issues of material fact with respect to the elements of its affirmative defense, the lack of specificity is fatal to the request for summary judgment. Were the releases executed and delivered the same day? A few days later? When were they recorded? All of these fact issues remain unresolved — and unanswered by this summary judgment record. *See Martin*, 353 F.3d at 412. Summary judgment is therefore denied as to CED's affirmative defense under section 547(c)(1).

B. *Ordinary Course of Business*

CED also asserts that the pre-petition payments it received are protected from recovery by section 547(c)(2) — the "ordinary course of business" exception. In support of this argument, CED offers evidence of the customary business practice in the contracting industry. *See* Wahne Affidavit

(Doc. #58, Ex. C).  The Trustee responds that the evidence merely establishes customary practices and does not prove the actual relationship between CED and the Debtor.  Because CED offers no specific evidence, the Trustee argues that a genuine issue of material fact exists regarding CED's actual business practices.  The court agrees.[16]

CED offers as evidence only Micknicz's general allegation that CED followed regular and customary business practices in its dealings with the Debtor.  *See* Micknicz Affidavit (Doc. #58, Ex. A).  CED fails to allege or present any specific facts regarding the actual ordinary course business dealings between CED and the Debtor.  In addition to the general allegation that CED followed customary practices, Micknicz offers the conclusory observation that the transfers were executed in the ordinary course of dealing between CED and the Debtors.  But legal conclusions are not sufficient as evidence to sustain CED's burden for this affirmative defense.  See *Hancey,* 925 F.2d at 97 (citing *Fentenot,* 780 F.2d at 1195-96).  Lacking is any specific evidence of CED's or the Debtor's regular business practices or procedures.  Based on the evidence provided in the motion, the court cannot conclude as a matter of law that these pre-petition transfers fall within the ordinary course exception of section 547(c)(2).  Summary judgment in favor of CED on this ground, therefore, must be denied.

C.  *Section 547(c)(6)*

The final ground for summary judgment asserted by CED in the Motion is that "[t]he

---

[16] This is a pre-BAPCPA case.  Section 547(c)(2) was amended by BAPCPA to permit the ordinary course defense to be established by proof of *either* customary business practices in the relevant industry *or* the ordinary business practices of this particular debtor and creditor.  Prior to this amendment, however, the affirmative defense requires the defendant to prove *both* of these elements.  *See Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In the Matter of Gulf City Seafoods, Inc.),* 296 F.3d 363, 367 (5th Cir. 2002) ("In sum, the creditor must show that as between it and the debtor, the debt was *both incurred and paid* in the ordinary course of their business dealings *and that* the transfer of the debtor's funds to the creditor was made in an arrangement that conforms with ordinary business terms — a determination that turns the focus away from the parties to the practices followed in the industry.") (emphasis added).

transfers fixing a statutory lien are exceptions to the Trustee's power to avoid preferential transfers." *See* Motion at 6 (Doc. #58).  This assertion appears to be an assertion of the affirmative defense under section 547(c)(6).  As discussed *supra*, even if CED could present facts supporting this defense,[17] it failed to do so. CED's mere mention of the defense falls well short its burden. Summary judgment in favor of CED thus must be denied on this ground as well.

### CONCLUSION

The court concludes, as a matter of law, that CED is not entitled to summary judgment on any of the grounds asserted in the Motion.  CED failed to carry its burdens with respect to all asserted affirmative defenses.  And CED failed to demonstrate the absence of genuine issues of material fact with respect to its ordinary defenses.  There remain genuine issues of material fact — whether CED may trace the funds it alleges to have been impressed with a trust, and whether CED would have received more through a chapter 7 liquidation had the pre-petition transfers not been made.  As the movant, CED therefore is not entitled to judgment as a matter of law.  As a result, CED's Motion for Summary Judgment is DENIED in all parts.

# # #

---

[17] That section states, "The trustee may not avoid under this section a transfer . . . that is the fixing of a statutory lien that is not avoidable under section 545 of this title."  11 U.S.C. § 547(c)(6).  Section 545 lists the types of statutory liens which a trustee may not avoid — certain statutory liens asserted on property of the *debtor*. *Id.* § 545.  This defense appears to be inapplicable where the creditor fixes statutory liens on property held by a third party, as was the case here.